**KALIELGOLD PLLC**
Sophia G. Gold (SBN: 307971)
sgold@kalielgold.com
490 43rd Street, Suite 122
Oakland, CA 94609
Telephone: (202) 350-4783

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (SBN 238293)
Amanda J. Rosenberg (SBN 278507)
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
arosenberg@kalielgold.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN: 330090)
scott@edelsberglaw.com
1925 Century Park East
Suite 1700
Los Angeles, CA 90067
Telephone: (305) 975-3320

*Attorneys for Plaintiff and the Proposed Class*

*]*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AZLYNNE HOARD, individually and on behalf of herself and all others similarly situated, | Case No: 3:24-cv-01133-MMA-VET |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CAPITAL ONE, N.A., | Hon. Michael M. Anello |
| Defendant. | |

Plaintiffs Azlynne Hoard and Chiquita Plenty ("Plaintiff") bring this action on behalf of themselves, and all others similarly situated against Defendant Capital One, N.A. ("Capital One" or "Defendant"), and state:

## I.     NATURE OF THE ACTION

1.     Plaintiffs bring this action on behalf of themselves and a proposed class of all similarly situated consumers against Defendant Capital One arising from its unfair, deceptive, and unlawful practice of assessing cash advance fees and immediately-accruing interest ("Cash Advance Fees") on credit card purchases that are not "cash advances" as that term is used in the Bank's Cardholder Agreement. In so doing, Capital One deceives credit card holders and breaches its agreement with its customers.

2.     Capital One, like most major credit card issuers, charges its customers steep Cash Advance Fees when customers elect to use their credit card to receive cash from an ATM or from a bank teller. Plaintiffs do not dispute Capital One's right under its Cardholder Agreement to charge Cash Advance Fees on these bona fide cash advances. What Capital One is not permitted to do under its Cardholder Agreement is to assess Cash Advance Fees on credit card transactions that are not cash advances at all. *See* Capital One Cardholder Agreement, attached as **Exhibit A**. The Cardholder Agreement is materially identical to the agreements for all members of the putative Class.

3.     Where the Agreement authorizes the Bank to assess Cash Advance Fees on cash or transactions that the Bank "considers" to be cash equivalents, Capital One may not keep secret its polices as to what it unilaterally "considers" to be a cash equivalent, and may not exercise its contractually-vested discretion in bad faith, electing to "consider" certain purchases to be "equivalent" to cash advances when they are not "equivalent" to cash advances at all. But that is exactly what it does, using that secrecy to assess Cash Advance Fees on credit card transaction types that do not share

FIRST AMENDED CLASS ACTION COMPLAINT

cash's essential characteristics—including that it is a totally fungible commodity that can be possessed and later used for any purpose or no purpose at all.

4.      Plaintiffs' experiences are illustrative. Plaintiff Hoard recently received a beauty treatment and paid the technician with her credit card using the Venmo mobile application. Unbeknownst to Plaintiff Hoard, Capital One unilaterally and in its sole discretion elected to treat Plaintiff's beauty treatment as a "cash advance," and charged Plaintiff a cash advance fee *plus* immediately accruing interest.

5.      Similarly, Capital One charged Plaintiff Plenty Cash Advance Fees on transactions made with her credit card using the CashApp mobile application.

6.      Capital One's imposition of Cash Advance Fees on these transactions, which was not for transactions that the Bank informed Plaintiffs it would "consider" a cash equivalent and was not reasonably considered an advance of cash as that term is used in the Cardholder Agreement, is contrary to the Bank's contractual promises and is deceptive.

7.      It is also contrary to industry practice. Some of Capital One's major competitors in the credit card industry such as American Express and Discover do not treat transactions like Plaintiff Hoard's beauty treatment as a "cash advance," as discussed herein. Other major American banks expressly inform their cardholders as to which transactions they consider cash equivalents. Capital One does neither.

8.      Capital One's Cardholder Agreement never stated its true practice of categorizing non-cash advance transactions as worthy of Cash Advance Fees. Plaintiffs and other reasonable consumers could not have determined from the Bank's Cardholder Agreement that it would adopt this unexpected, unreasonable, and bad faith policy.

9.      Plaintiffs bring this action on behalf of themselves and a proposed class of all other similarly situated Capital One credit card holders who were improperly charged Cash Advance Fees on transactions that Capital One did not disclose to be equivalent to cash advances. Plaintiffs seek to end Capital One's deceptive practices

and force it to refund improper fees and interest charges. Plaintiffs seek damages, restitution, and injunctive relief, as set forth more fully below.

## II.    PARTIES

10.    Plaintiff Azlynne Hoard is a citizen and resident of Poway, California and the holder of a Capital One VentureOne credit card and Capital One Quicksilver credit card.

11.    Plaintiff Chiquita Plenty is a citizen and resident of Douglasville, Georgia and the holder of a Capital One QuicksilverOne credit card.

12.    Defendant Capital One, N.A. is a national credit card issuer with its headquarters and principal place of business located in McLean, Virginia. Capital One operates banking centers and thus, conducts business throughout the United States, including within this district.

## III.    JURISDICTION AND VENUE

13.    This Court has original jurisdiction over the action under the Class Action Fairness Act ("CAFA") of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interests and costs, and at least one member of the proposed class is a citizen of a different state than Capital One.

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Capital One is subject to personal jurisdiction here and regularly conducts business in this district, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## IV.    FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A.    Credit Card Cash Advances

15.    American credit card issuers generally provide a "grace period" for almost all transactions, and do not charge up-front fees for such purchases. If a cardholder pays for a purchase in full prior to the beginning of the next billing cycle, generally that cardholder will not pay any interest or fees on that purchase.

16.     The exception is for cash advances. Credit card issuers generally treat cash advances differently in order to discourage the use of credit cards for cash loans. Issuers generally assess interest beginning immediately for cash advances from an ATM or a bank teller, and also assess up-front fees for using a credit card to perform such a cash advance.

17.     It is therefore extremely expensive to borrow cash with a credit card. The distinction between a purchase and a cash advance is crucial and can mean a difference in interest and fees of tens or hundreds of dollars on a purchase. For example, if a $100 purchase were instead treated as a "cash advance" by Capital One, the transaction would come with a $5 advance fee and over $8 in immediately-accruing interest—both of which would not be charged otherwise. Additionally, the purchase would not be eligible to receive any rewards, such as any promised cashback reward.

**B.      Capital One Promises to Charge Cash Advance Fees Only on Cash Advances and Disclosed "Cash Equivalents."**

18.     Capital One credit card holders are subject to Capital One's Cardholder Agreement.

19.     Capital One's Cardholder Agreement is a form contract. The contract is materially uniform across all Capital One branded cards, and states in relevant part:

Cash Advance: Either $5 or 5% of the amount of each cash advance, whichever is greater.

[…]

APR for Cash Advances Non-introductory rates between 27.74% and 32.74%.

[…]

"Cash Advance" <u>means a loan in cash or things we consider cash equivalents</u>, including wire transfers, travelers' checks, money orders, foreign currency, lottery tickets, gaming chips, and wagers. We post Cash Advances to the Cash Advance Segment of your Account and not to your purchase Segment.

Ex. A at 1, 6 (emphasis added).

20.    Under the Agreement, then, Capital One may assess Cash Advance Fees on "loans in cash or things we consider cash equivalents" like money orders or travelers' checks. The Bank may not assess Cash Advance Fees on other transactions.

21.    Unlike other major American banks discussed below, Capital One keeps secret major transaction types that it "consider[s] [to be] cash equivalents," excluding them from enumeration in the Cardholder Agreement. There is, of course, no way for a cardholder to know what Capital One "consider[s] [to be] cash equivalents" unless such supposed "equivalents" are listed in the Cardholder Agreement. Capital One does not include peer-to-peer transfers like Plaintiffs' in its definition of Cash Advances.

22.    As Capital One is aware, payment apps like that used by Plaintiffs are massively popular and commonly used components of consumers' economic activity in the U.S. Capital One alone knows that it "considers" transactions using those apps to be "cash equivalents," but keeps this policy decision secret.

23.    By operation of the contract interpretation principle *expressio unius est exclusio alterius*, the exclusion from its list of "consider[s] [to be] cash equivalents" was intentional and fairly means Capital One does not consider such transactions to be "cash equivalents."

24.    Additionally, it was bad faith and deceptive for Capital One to hide from cardholders its true list of transaction types it "consider[s] [to be] cash equivalents," especially where it alone knew or could know what it "considered" and especially where peer to peer payments are a popular transaction type for U.S. consumers.

25.    Further, even if the Bank could keep what it considers to be a "cash equivalent" secret from its cardholders, it would be objectively unreasonable to consider transactions like Plaintiffs' to be a cash equivalent.

26.    However, as a matter of policy Capital One does just that. Capital One routinely charges Cash Advance Fees on transactions that are <u>not</u> "loans in cash" and are <u>not</u> reasonably understood as "cash equivalents." Indeed, the Bank assesses such

fees on transactions that are not close equivalents to cash and that totally lack cash's essential characteristic as a fungible method of payment.

27.    The terms "cash" or "cash equivalent" reasonably mean currency or currency equivalents that can be used for any purpose. Cash, like the travelers' checks, money orders, or foreign currency specified in Capital One's definition of "cash equivalents," can be independently possessed to make a later purchase or transfer—or simply to place under a proverbial mattress.[1]

28.    But as demonstrated by Plaintiffs' experiences, Capital One assesses Cash Advance Fees on transactions that are not cash loans or cash equivalents. Plaintiffs never received any cash or a cash equivalent from Capital One that could later be used for a purchase.

29.    Upon information and belief, Capital One systematically and unreasonably treats payments made on peer-to-peer mobile applications as "cash advances," and systematically assesses Cash Advance Fees on such transactions. In so doing, Capital One breaches its contractual promises and breaches the covenant of good faith and fair dealing.

30.    Capital One's Cash Advance Fees, when assessed on transactions that are not fairly disclosed to be "cash equivalents," are problematic junk fees because an accountholder has no reasonable way to predict or understand which transactions Capital One will consider cash advances and which will not be unless they are enumerated in the Capital One Cardholder Agreement.

31.    Tellingly, for many years Capital One did *not* treat payments made on peer-to-peer mobile applications as "cash advances" and did *not* charge Cash Advance

---

[1] A "wire transfer" is a technical banking term meaning direct, cash transfers between two financial institutions using networks such as the Fedwire Funds Service (Fedwire) or Society for Worldwide Interbank Financial Telecommunication (SWIFT). Apps like Paypal, Cash App and Venmo are not financial institutions, do not require bank accounts, and do not employ wire transfers.

FIRST AMENDED CLASS ACTION COMPLAINT

1  Fees on such transactions. Only recently, and unbeknownst to consumers, did it change

2  its policy.

3      32.    At best, Capital One's Cardholder Agreement is ambiguous as to the

4  meaning of the term "cash equivalents." Any ambiguity in a consumer contract of

5  adhesion should be strictly construed against the drafter, Capital One, and in favor of

6  the consumer.

7      33.    A comparison of Capital One's agreement with other credit card

8  agreements demonstrates the ambiguity. American Express's credit card agreement is

9  like Capital One's in that it does not include payments made on peer-to-peer mobile

10  applications as cash advances. Specifically, American Express's agreement states:

11
12      A ***cash advance*** is a charge to get cash or cash equivalents, including travelers cheques, gift cheques, foreign currency, money orders, digital currency, casino gaming chips, race track wagers, and similar offline and

13  online betting transactions.

14  Unlike Capital One, however, American Express does ***not*** treat payments made on

15  peer-to-peer mobile applications as cash advances and does not charge Cash Advance

16  Fees on transactions made through those applications.

17      34.    Similarly, Discover Bank does not define payments made on peer-to-peer

18  mobile applications as cash advances and does not charge Cash Advance Fees on

19  transactions made through those applications.

20      35.    Conversely, other major credit issuers such as Bank of America and Chase

21  clearly and explicitly disclose in their agreements that such transactions will be treated

22  as cash advances and subject to cash advance fees.

23      36.    For example, Bank of America's credit card agreement defines a cash

24  advance far more broadly than Capital One does, and clearly and explicitly discloses

25  that it considers "person-to-person money transfers" as equivalent to a cash advance:

26      Bank Cash Advance: by loans accessed in the following manner:
        a. ATM Cash Advance: at an automated teller machine;

27          b. Over the Counter ("OTC") Cash Advance: at any financial institution (e.g., to obtain cash, money orders, wire transfers, or travelers

28  checks);

c. Same-Day Online Cash Advance: by a same day online funds transfer to a deposit account;

d. Overdraft Protection Cash Advance: by a transfer of funds to a deposit account pursuant to an overdraft protection program (see the section titled Overdraft Protection below);

e. Cash Equivalents: by the purchase of foreign currency, money orders, travelers checks, wire transfers, or to obtain cash, each from a non-financial institution, or *person-to-person money transfers*, bets, lottery tickets purchased outside the United States, casino gaming chips, cryptocurrency to the extent accepted, or bail bonds, with your card or account number (including through the use of an enabled mobile device).

37.    Likewise, Chase's credit card agreement states:

Cash-like transactions will be treated as cash advances. Cash-like transactions include, but are not limited to, the following transactions to the extent they are accepted:
• purchasing travelers checks, foreign currency, money orders, wire transfers, cryptocurrency, other similar digital or virtual currency and other similar transactions;
• purchasing lottery tickets, casino gaming chips, race track wagers, and similar offline and online betting transactions;
• *person-to-person money transfers* and account-funding transactions that transfer currency; and
• making a payment using a third party service including bill payment transactions not made directly with the merchant or their service provider.

38.    The reason these other major American banks specify that person to person money transfers are "cash-like" or "cash equivalent" is because it would be unreasonable to understand that such transfers are cash-like without an express disclosure stating as much.

39.    Unlike Chase and Bank of America, Capital One never defines a "cash advance" to include transactions using person to person money transfer services.

**C.    Plaintiff Hoard's Experience**

40.    By way of example, on February 25, 2024, Plaintiff Hoard received a beauty treatment and paid the technician $130 with her Capital One credit card vis-à-vis the Venmo mobile application. Capital One deemed Plaintiff Hoard's beauty treatment as a "cash advance" and charged Plaintiff a cash advance fee, in addition to immediately-accruing interest, and did not count her purchase towards any cash back rewards.

41.    Had Plaintiff Hoard known Capital One would consider Plaintiff Hoard's payment via Venmo to be a cash advance, Plaintiff would have chosen to make the payment for her beauty treatment a different way.

**D.    Plaintiff Plenty's Experience**

42.    By way of example, on September 27, 2024, Plaintiff Plenty paid her hairdresser $100 with her Capital One credit card vis-à-vis the CashApp mobile application. Capital One deemed Plaintiff Plenty's beauty treatment as a "cash advance" and charged Plaintiff Plenty a cash advance fee, in addition to immediately-accruing interest, and did not count her purchase towards any cash back rewards.

43.    Had Plaintiff Plenty known Capital One would consider Plaintiff Plenty's payment via CashApp to be a cash advance, Plaintiff would have chosen to make the payment for her beauty treatment a different way.

**V.    CLASS ACTION ALLEGATIONS**

44.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated. The proposed Class includes:

> All holders of a Capital One credit card who, within the applicable statute of limitations preceding the filing of this lawsuit up until the date of class certification, were charged Cash Advance Fees on transactions other than for: a loan in cash, wire transfers, travelers' checks, money orders, foreign currency, lottery tickets, gaming chips, and wagers (the "Class").

45.    Additionally, Plaintiffs propose a California and Georgia subclass for the foregoing class ("California Subclass" and "Georgia Subclass").

46.    Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

47. Plaintiffs reserve the right to modify or amend the definition of the proposed Class and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

48. **Numerosity (Rule 23(a)(1)).** The proposed Class is numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Capital One's records. The proposed Class is also sufficiently ascertainable because Capital One has the administrative capability through its computer systems and other business records to identify all members of the proposed Class, and such specific information is not otherwise available to Plaintiffs.

49. **Commonality (Rule 23(a)(2)).** The questions here are ones of common or general interests such that there is a well-defined community of interest among the proposed Class members. These questions predominate over questions that may affect only individual Class members because Capital One has acted on grounds generally applicable to the proposed Class. Such common legal or factual questions include, but are not limited to:

    a.    Whether Capital One breached its contract with accountholders and/or breached the implied covenant of good faith and fair dealing;

    b.    Whether the meaning of "cash equivalents" in Capital One's Cardholder Agreement is ambiguous;

    c.    Whether Plaintiffs and other members of the proposed Class are entitled to injunctive relief to enjoin Capital One's from its unlawful business practices described herein; and

    d.    Whether Plaintiffs and other members of the proposed Class have sustained damages because of Capital One's wrongful business practices described herein and the measure of damages.

50.    **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of the other proposed Class members in that they arise out of the same wrongful business practice by Capital One, as described herein.

51.    Plaintiffs are more than an adequate representative of the proposed Class in that they have suffered damages because of Capital One's improper business practices. Additionally:

a.    Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b.    There is no conflict of interest between Plaintiffs and the unnamed Class members;

c.    Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d.    Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

52.    **Predominance & Superiority (Rule 23(b)(3)).** Common questions of fact or law concerning Capital One's liability to all class members for charging Cash Advance Fees on transactions a reasonable person would not understand to be a loan in cash or equivalent to a cash advance based on the Capital One Cardholder Agreement predominate over any questions affecting only individual class members. Plaintiffs' proposed class action is the superior method for resolving this dispute because it is impracticable to bring proposed Class members' individual claims before the Court, especially where, as here, individual class members' damages are relatively small. Class treatment permits many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent

or contradictory judgments that numerous individual actions would engender. The benefits of the class action mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

53. **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).** Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to each of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

54. **Particular Issues (Rule 23(c)(4)).** Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(c)(4). Plaintiffs' claims consist of particular issues that are common to all members of the Classes and are capable of class-wide resolution that will significantly advance the litigation.

## FIRST CAUSE OF ACTION
### Breach of Contract Including Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiffs and the Classes)

55. Plaintiffs incorporate the allegations in paragraphs 1 through 54 by reference as if fully set forth herein.

56. Plaintiffs and members of the Class contracted with Capital One for a credit card, as embodied in the Capital One Cardholder Agreement.

57. Capital One breached the terms of its contract with consumers when, as described herein, Capital One charged Cash Advance Fees on transactions a reasonable person would not understand to be a loan in cash or equivalent to a cash advance based on the text of the Capital One Cardholder Agreement.

58. Further, under the law of each of the states where Capital One does business, an implied covenant of good faith and fair dealing governs every contract.

The covenant of good faith and fair dealing constrains Capital One's discretion to abuse self-granted contractual powers. This good faith requirement extends to the way a party employs discretion conferred by a contract.

59.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contract.

60.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes her conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

61.    Capital One breached the implied covenant of good faith and fair dealing when it charged Cash Advance Fees on transactions a reasonable person would understand to be a loan in cash or equivalent to a cash advance. Reasonable consumers would have no reason to conclude, based on the Capital One Cardholder Agreement's ambiguous definition of cash advance equivalents, that they would be charged Cash Advance Fees for such purchases.

62.    Capital One's breach of the implied covenant of good faith and fair dealing is particularly egregious with respect to transactions made via peer-to-peer mobile applications because, for many years, Capital One customers who used their credit cards as the form of payment for such transactions were never charged Cash Advance Fees by Capital One, yet Capital One began charging Cash Advance Fees on such transactions without providing notice in the Capital One Cardholder Agreement. Capital One's bad faith conduct starkly contrasts with the good faith conduct of

competing banks that either do not charge Cash Advance Fees for transactions made via peer-to-peer mobile applications or that do charge such fees based on express contractual disclosures.

63.    Each of Capital One's actions were done in bad faith and were arbitrary and capricious.

64.    Plaintiffs and members of the Class have performed all the obligations imposed on them under the contract.

65.    Plaintiffs and members of the Class have sustained monetary damages because of Capital One's breaches of the contract and implied covenant of good faith and fair dealing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Capital One for themselves and the proposed Class members as follows:

a.    Certifying the proposed Class, appointing Plaintiffs as representatives of the Class, and appointing Plaintiffs' counsel as class counsel for the proposed Class;

b.    Declaring that Capital One's policies and practices described herein constitute a breach of contract and breach of the covenant of good faith and fair dealing;

c.    Enjoining Capital One from the wrongful conduct as described herein on behalf of the general public;

d.    Awarding actual damages and statutory damages in an amount according to proof;

e.    Awarding treble damages, if permitted by law;

f.    Awarding pre-judgment interest at the maximum rate permitted by applicable law;

# EXHIBIT A

# Credit Card Agreement for Consumer Cards in Capital One, N.A.

There are two parts to this Credit Card Agreement: **Capital One Pricing Information** and the **Capital One Customer Agreement**. The **Pricing Information** shows a range of terms that includes both mail and online offers for new accounts available under this Agreement as of March 31, 2024. The combination of terms that could apply to you will differ depending on the specific card offer and on your creditworthiness at the time of application. Not all offers will contain introductory rates. The **Customer Agreement** contains important information related to consumer credit cards issued by Capital One, N.A. Please visit www.capitalone.com to view our online credit card offers. If you are a current Capital One cardholder, please log in to your account if you would like to request the Credit Card Agreement for your account(s).

| CAPITAL ONE PRICING INFORMATION | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | Introductory rate of **0%** for 9 months. <br><br> Non-introductory rates between **22.74%** and **32.74%**. <br> This APR will vary with the market based on the Prime Rate. |
| **APR for Transfers** | Non-introductory rates between **22.74%** and **32.74%**. <br><br> This APR will vary with the market based on the Prime Rate. |
| **APR for Cash Advances** | Non-introductory rates between **27.74%** and **32.74%**. <br><br> This APR will vary with the market based on the Prime Rate. |
| **Paying Interest** | Your due date is at least 25 days after the close of each billing cycle. We will not charge you interest on new purchases, provided you have paid your previous balance in full by the due date each month. We will begin charging interest on cash advances and transfers on the transaction date. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at **http://www.consumerfinance.gov/learnmore**. |

| Annual Fee | Between **$0** and **$39** annually. |
|---|---|
| **Transaction Fees** | |
| • Transfer | **3%** of the amount of each transferred balance that posts to your account at a promotional APR that we may offer you. <br><br> None for balances transferred at the Transfer APR. |
| • Cash Advance | Either **$5** or **5%** of the amount of each cash advance, whichever is greater. |
| **Penalty Fees** | |
| • Late Payment | Up to **$40**. |

**How Do You Calculate My Balance?** We use a method called "average daily balance (including new transactions)." See "How Do You Calculate The Interest Charge?" section below.

**What Are My Billing Rights?** Information on your rights to dispute transactions and how to exercise those rights is provided in "Your Billing Summary" on your Statement and other Truth-in-Lending Disclosures.

### _THINGS YOU SHOULD KNOW ABOUT THIS CARD_

**How Do You Calculate My Variable Rates?** Your variable rates may change when the Prime Rate changes. We calculate variable rates by adding a percentage to the Prime Rate published in _The Wall Street Journal_ on the 25th day of December, March, June and September. If the _Journal_ is not published on that day, then see the immediately preceding edition. Variable rates on the following segment(s) will be updated quarterly and will take effect on the first day of your January, April, July and October billing periods: Non-Introductory Purchase APR: Prime plus a margin between 14.24% and 24.24%; Non-Introductory Transfer APR: Prime plus a margin between 14.24% and 24.24%; Cash Advance APR: Prime plus a margin between 19.24% and 24.24%. Any increase in the Prime rate may increase your Interest Charges and your Minimum Payment.

**What Are The Daily Periodic Rates Used To Calculate My Interest?** The daily periodic rate for your Introductory Purchase APR is 0.00000%, Non-introductory Purchase APR is between 0.06230% and 0.08970%, Non-introductory Transfer APR is between 0.06230% and 0.08970%, and Cash Advance APR is between 0.07600% and 0.08970%. See "How Do You Calculate The Interest Charge?" section below.

**How Do You Calculate The Interest Charge?** We use a method called Average Daily Balance (including new transactions). Under this method, we first calculate your daily balance; for each segment, 1) take the beginning balance and add in new transactions and the periodic interest charge on the previous day's balance, then 2) subtract any payments and credits for that segment as of that day. The result is the daily balance for each segment. However, if you paid your previous month's balance in full (or if your balance was zero or a credit amount), new transactions which post to your purchase or special purchase segments are not added to the daily balances. Also, transactions subject to a grace period are not added to the daily balances.

Next, to find your Average Daily Balance: 1) add the daily balances together for each segment, and 2) divide the sum by the number of days in the billing cycle.

At the end of each billing cycle, we determine your Interest Charge as follows: 1) multiply your Average Daily Balance by the daily periodic rate (APR divided by 365) for that segment, and 2) multiply the result by the number of days in the billing period.

NOTE: Due to rounding or a minimum interest charge, this calculation may vary from the interest charge actually assessed.

©2024 Capital One. Capital One is a federally registered service mark. All rights reserved. Products and services offered by Capital One, N.A. Capital One supports information privacy protection: see our website at www.capitalone.com.

## Capital One Customer Agreement

### Welcome to Capital One

Thank you for opening a credit card account with us. This Customer Agreement including any changes to it ("Agreement") contains the terms of your agreement with Capital One.

### Definitions

The meanings of the terms you see in italics appear in the **Glossary** section at the end of this Agreement.

As used here, "you" and "your" mean each applicant and co-applicant for the *Account*; any person responsible for paying the *Account*; and any person responsible for complying with this Agreement. "We," "us," "our," and "Capital One" mean Capital One, National Association; and its agents, authorized representatives, successors, and assignees.

### Account Documents

The following documents govern your *Account* with us:

(1) this Agreement;
(2) all *Statements*;
(3) any rewards program terms, conditions, and disclosures;
(4) any privacy notices;
(5) your *Card* benefits brochure which describes benefits provided by the *Payment Card Network* for your *Account*;
(6) all disclosures and materials provided to you before or when you opened your *Account*;
(7) any other documents and disclosures relating to your *Account*, including those provided online; and
(8) any future changes we make to any of the above.

Please read these carefully and keep them for future reference.

### New Offers

In the future, we may provide you with new offers that we think may interest you. The terms of these offers may differ from the standard terms on your *Account*. This Agreement will still apply.

### Account Information

We need information about you to manage your *Account*. This includes:

(1) your legal name;
(2) a valid U.S. mailing address and residential address (if different);
(3) your date of birth;
(4) your Social Security number or other government identification number;
(5) your telephone number(s); and
(6) your employment and income information.

You must tell us when this information changes. We may ask you for additional documents to verify any changes. We may restrict or close your *Account* if we cannot verify your information, or if you do not provide it as requested.

### Credit Limits

When you open your *Account*, we will tell you your credit limits. These will also appear on your *Statement*. We may also refer to your credit limits as your credit lines. We may give you different credit limits for the different *Segments* of your *Account*. For example, you may have one credit limit for purchases and a different one for *Cash Advances*.

You are responsible for keeping track of your *Segment* balances and your available credit. You must manage your *Account* to remain below your credit limits. We may honor transactions above your credit limits, but if we do these transactions will not increase your credit limit. You are responsible for paying for any transaction you make above your credit limits.

We may also increase, decrease, restrict or cancel your credit limit on any *Segment* at any time. This will not affect your obligation to pay us.

### Using Your Account

(1) This Agreement applies whether or not you use your *Card* or *Account*. It will continue to apply even after your *Account* is closed, as long as you have a balance.
(2) You must sign the *Card* immediately when you receive it.
(3) You must return the *Card* to us or destroy it if we ask you to.
(4) You must take reasonable steps to prevent the unauthorized use of your *Card*, *Access Checks* and *Account*.
(5) We may decline to authorize a transaction for any reason. This may occur even if the transaction would not cause you to go over your credit limit or your *Account* is not in default.
(6) We are not responsible for any losses you incur if we do not authorize a transaction.
(7) We are not responsible for any losses you incur if anyone refuses to accept your *Card* for any reason.
(8) Unless we tell you otherwise, we will bill each transaction to the applicable *Segment* of your *Account*. We will apply it against your available credit for that *Segment*.
(9) You may obtain *Cash Advances* and *Transfers* as permitted for your *Account*. You may not use these to pay any amount you owe us or any other company in the Capital One organization.
(10) You must not use, or try to use, the *Card* for any illegal activity. You are responsible for any charges if you do.

(11) We are not liable for any losses that may result when our services are unavailable due to reasons beyond our control.

## Rewards

Your *Account* may provide you with the opportunity to earn rewards. If it does, we will separately provide you with information and terms about the rewards.

## Access Checks

We may provide you with *Access Checks*. If we do, we will tell you at the time if we consider them purchases, *Cash Advances* or *Special Transfers*.

Only the person we designate may use *Access Checks*. You may not use them to pay any amount you owe us or any other company in the Capital One organization. We may reject and not pay any *Access Check* if:

(1) your *Account* is past due, charged off, bankrupt, lost/stolen or closed;
(2) we suspect fraud;
(3) your *Account* is over the credit limit; or
(4) the check has expired, is damaged or cannot otherwise be processed.

Our liability if we do not pay an *Access Check* will never be more than (1) your actual damages or (2) the amount of the *Access Check*, whichever is less.

Use of an *Access Check* is not the same as using your *Card*. When you use an *Access Check*, you will have fewer rights to dispute merchant transactions than with uses of your *Card*. Please see the "Billing Rights Summary" on your *Statement* and your other *Truth-in-Lending Disclosures* for more information.

## Stopping Payment of Access Checks

You may request a stop payment on any *Access Check* by contacting Customer Service.

We will have a reasonable amount of time after your stop payment request to research and complete the stop payment. We will not be responsible if we cannot complete the stop payment. Reasons include:

(1) the *Access Check* was already paid;
(2) you do not give us the information we asked for; or
(3) the information you gave us was incorrect.

We do not have to release the stop payment order unless the account holder who made the request asks us to. If we re-credit your *Account* after a valid stop payment order, you give us all of your rights against the payee or other holder of the paid *Access Check*. You also agree to help us in any legal action we may later take against the payee or other holder of the check.

## Using a PIN

We may give you a personal identification number (PIN). For security reasons, you may have to provide the PIN before you are able to use your *Card*.

Keep your PIN secure. Do not write it down, give it to anyone, or keep it with your *Card*. If you lose your *Card* or believe the confidentiality of your PIN has been compromised for any reason, you must contact Customer Service immediately.

## Authorized Users

If you ask us to issue a *Card* to any other person, they are an *Authorized User*. We may require certain information about them. We may limit their ability to use your *Card*. They may have access to certain information about your *Account*. You will be responsible for their use of the *Account* and anyone else they allow to use your *Account*, even if you did not want, or agree to, that use.

## Removing an Authorized User

If you want to remove an *Authorized User* from your *Account*, you must contact Customer Service and request their removal. You also must immediately destroy all *Cards* in their possession and cancel any arrangements they may have set up on your *Account*. They will be able to use your *Account* until you have notified us that you are removing them from your *Account*. During this time, you will still be responsible for all amounts they charge to your *Account*. You will be responsible even if these amounts do not appear on your *Account* until later.

*Authorized Users* may remove themselves from your *Account* upon request. We reserve the right to remove them from your *Account* for any reason. To remove them from your *Account*, we may close your existing *Account* and issue a new *Card* with a new *Account* number.

## Your Promise to Pay

You promise to pay us all amounts due on your *Account*. This includes amounts where you did not sign a purchase slip or other documents for the transaction. We will treat transactions made without presenting your actual *Card* (such as for mail, telephone, Internet, or mobile device purchases) the same as if you used the *Card* in person. If you let someone else use your *Card*, you are responsible for all transactions that person makes.

## Statements

We will generally send or make available to you one *Statement* for all *Cards* on your *Account* at the end of each *Billing Cycle*. Under certain circumstances, the law may not require us to send or make available to you a *Statement*, or may prohibit us from doing so.

## Disputed Transactions

You must inspect each *Statement* you receive. Tell us about any errors or questions you have, as described in the "Billing Rights Summary" on your *Statement* and other *Truth-in-Lending Disclosures*. If you do not notify us of an error, we will assume that all information on the *Statement* is correct.

If we credit your *Account* for all or part of a disputed transaction, you give us all of your rights against others regarding that transaction. You will also:

(1) give us any information about the disputed transaction, if we ask;
(2) not pursue any claim or reimbursement of the transaction amount from the merchant or any other person; and
(3) help us get reimbursement from others.

## No Warranties

We are not responsible for any claim you may have regarding the purchase of goods or services made with your *Card* beyond your rights described in the "Billing Rights Summary" on your *Statement*.

## Lost or Stolen Card

If your *Card* is lost or stolen or if you think someone else may be using your *Card* or *Account* number without your permission, you must contact Customer Service immediately. You will not be responsible for transactions on your *Account* that we find are unauthorized.

If we reimburse you for unauthorized transactions, you will help us investigate, pursue and get reimbursement from the wrongdoer. Your help includes giving us documents in a form that we request.

## Interest Charges and Fees

We will charge *Interest Charges* and *Fees* to your *Account* as disclosed on your *Statement* and other *Truth-in-Lending Disclosures*. In general, *Interest Charges* begin to accrue from the day a transaction occurs. However, we will not charge you interest on any new transactions posted to the purchase *Segment* of your *Account* if you paid the total balance across all *Segments* of your *Account* in full by the due date on your *Statement* each month. From time to time, we may give you offers that allow you to pay less than the total balance and avoid *Interest Charges* on new purchase *Segment* transactions. If we do, we will provide details in the specific offer.

We will generally treat *Fees* as purchase transactions unless otherwise specified below. These *Fees* apply to your *Account* only if your *Truth-in-Lending Disclosures* provide for them. We may increase your *Interest Charges* and *Fees* as described in the **Changes to Your Agreement** section or in your *Truth-in-Lending Disclosures*.

## Membership Fee

If your *Account* has a membership *Fee*, we may charge the first membership *Fee* either on the day you activate your *Card* or on the day when you use your *Account*, whichever occurs first. If your *Account* terms include a $0 introductory *Fee*, we may charge the first *Fee* when the introductory period ends. If it is an annual *Fee*, we may then charge it approximately once per year. If it is a monthly *Fee*, we may charge it each *Billing Cycle*.

## Late Payment Fee

We may charge you this *Fee* if we do not receive your payment as instructed on your *Statement* by the payment due date.

## Returned Payment Fee

We may charge you this *Fee* each time your financial institution for any reason rejects a payment you make to us.

## Stop Payment Fee

We may charge you this *Fee* each time you ask us to (1) stop payment on an *Access Check* or (2) renew an existing stop payment order.

## Cash Advance Fee

We may charge you this *Fee* each time you take out a *Cash Advance*. We will treat this *Fee* as a *Cash Advance* transaction.

## Transfer Fee

We may charge you this *Fee* each time you make a *Transfer*. We will charge the *Fee* to the same *Segment* where we post the *Transfer*.

## Transactions Made in Foreign Currencies

If you make a transaction in a foreign currency, the *Payment Card Network* will convert it into a U.S. dollar amount. *The Payment Card Network* will use its own currency conversion procedures. The conversion rate in effect on the processing date may differ from the rate in effect on the transaction date that appears on your *Statement*. We do not adjust the currency exchange rate or charge any currency conversion *Fees*.

## Minimum Payment

You must pay us at least the minimum payment amount by the payment due date. Your *Statement* will tell you:

(1) the minimum payment due,
(2) your new balance,
(3) the payment due date, and
(4) an explanation of when the payment must reach us for us to consider it received as of that date.

Returns and other credits to your *Account* will reduce your *Account* balance, but they will not change your minimum payment amount.

In addition to the minimum payment, you may pay all or part of the total balance on your *Account*. But, you must still pay at least the minimum payment amount each month, even if you paid more than the minimum payment due on the previous *Statement*. We will continue to charge *Interest Charges* during *Billing Cycles* when you carry a balance regardless of

whether your *Statement* includes a minimum payment that is due. If your *Account* is 180 days past due, is part of a bankruptcy proceeding or is otherwise charged off, the total balance is immediately due and payable.

## Making Payments

Your payment must be made in U.S. dollars from a U.S. deposit account in a form acceptable to us. We do not accept cash payments through the mail. You may not make payments with funds from your *Account* or any other credit account with us or any other company in the Capital One organization. You must send mailed payments to us as instructed on your *Statement*, unless we tell you otherwise.

## Other Payment Services

We may make services available that allow you to make faster or recurring payments online or by telephone. We will describe the terms for using these services and any applicable *Fee* before you use them. You do not have to use these other payment services.

We are not responsible if your financial institution rejects a payment made using our payment services.

If you ask someone else to make a payment for you, we may provide that person with limited *Account* information necessary to set up and process that payment. We may also refuse to accept that payment. If we do accept it, you will be responsible for that payment even if a financial institution rejects it.

## Payment Processing

We may accept and process payments without losing any of our rights. We may delay the availability of credit until we confirm that your payment has cleared. This may happen even if we credit your payment to your *Account*. We may resubmit and collect returned payments electronically. If necessary, we may adjust your *Account* to correct errors, process returned and reversed payments, and handle similar issues.

When you send us an *Item* as payment, you authorize us to make a one-time electronic fund transfer from your deposit account. You also authorize us to process the payment as an *Item*. We may withdraw the funds from your deposit account as early as the same day we receive your payment. You will not receive your *Item* back from your bank. We will provide additional information about this process on your *Statement*.

We may use the information from an *Item* to create an electronic image. We may collect and return the image electronically. This electronic image may also be converted to a substitute check and may be processed in the same way we would process an *Item*. We will not be responsible if an *Item* you provide has physical features that when imaged result in it not being processed as you intended.

## How We Apply Your Payments

Your *Account* may have *Segments* with different Annual Percentage Rates (APR). For example, purchases may have a lower APR than *Cash Advances*. If your *Account* has *Segment* balances with different APRs, here is how we apply payments in a *Billing Cycle*:

(1) We generally apply credits and payments up to your minimum payment first to the balance with the lowest APR, and then to balances with higher APRs.
(2) We apply any part of your payment exceeding your minimum payment to the balance with the highest APR, and then to balances with lower APRs.

## Items with Restrictive Words, Conditions, or Instructions

You must mail all *Items* bearing restrictive words, conditions, limitations, or special instructions to:

Capital One
PO Box 1330
Charlotte, NC 28201-1330

This includes *Items* marked "Paid in Full" or similar language. This also includes all accompanying communications.

If you make such a payment or send any accompanying communications to any other address, we may reject it and return it to you. We may also accept it and process it without losing any of our rights.

## Credit Balances

We may reject and return any payment that creates or adds to a credit balance on your *Account*. Any credit balance we allow will not be available until we confirm that your payment has cleared. We may reduce the amount of any credit balance by any new charges. You may write to the address provided on your *Statement* or call Customer Service to request a refund of any available credit balance.

## Account Default

You will be in default if:

(1) you do not make any payment when it is due;
(2) any payment you make is rejected, not paid or cannot be processed;
(3) you exceed a credit limit;
(4) you file or become the subject of a bankruptcy or insolvency proceeding;
(5) you are unable or unwilling to repay your obligations, including upon death or legally declared incapacity;
(6) we determine that you made a false, incomplete or misleading statement to us, or you otherwise tried to defraud us;
(7) you do not comply with any term of this Agreement or any other agreement with us; or

(8) you permanently reside outside the United States.

If you are in default, we may take certain actions with respect to your *Account*. For example, depending on the default, we may take the following actions, without notifying you, unless the law says that we must give you notice:

(1) charge you *Fees*, or change the APRs and *Fees* on your *Account*, if provided in your *Truth-in-Lending Disclosures*;
(2) close or suspend your *Account*;
(3) lower your credit limit(s);
(4) demand that you immediately pay the total balance owing on your *Account*;
(5) continue to charge you *Interest Charges* and *Fees* as long as your balance remains outstanding; and/or
(6) file a lawsuit against you, or pursue another action that is not prohibited by law. If we file a lawsuit, you agree to pay our court costs, expenses and attorney fees, unless the law does not allow us to collect these amounts.

## Communications

You agree that we may communicate with you by mail, telephone, email, fax, prerecorded message, automated voice, text message or other means allowed by law regarding your *Account*.

You agree that we may contact you at any telephone number (including a mobile telephone number that you provide us), and use an automated telephone dialing system or similar device to do so. You agree that we may monitor or record any conversation or other communication with you.

## Credit Reports

We may report information about your *Account* to credit bureaus and others. Late payments, missed payments, or other defaults on your *Account* may be reflected in your credit report. Information we provide may appear on your and the *Authorized Users*' credit reports.

If you believe that we have reported inaccurate information about your *Account* to a credit bureau or other consumer reporting agency, notify us in writing at PO Box 30281, Salt Lake City, UT 84130-0281. When you write, tell us the specific information that you believe is incorrect and why you believe it is incorrect.

We may obtain and use credit, income and other information about you from credit bureaus and others as the law allows.

## Closing or Suspending Your Account

You may contact Customer Service to ask us to close your *Account*.

We may close or suspend your *Account* at any time and for any reason permitted by law, even if you are not in default.

If we close or suspend your *Account* for any reason, you must stop using your *Card*. You must also cancel all billing arrangements set up on the *Account*. If we close or permanently suspend your *Account*, you must return or destroy all *Cards*. You must still pay us all amounts you owe on the *Account*.

## Changes to Your Agreement

At any time, we may add, delete or change any term of this Agreement, unless the law prohibits us from doing so. We will give you notice of any changes as required by law. We may notify you of changes on your *Statement* or in a separate notice. Our notice will tell you when and how the changes will take effect. The notice will describe any rights you have in connection with the changes.

Your variable APRs (if applicable) can go up or down as the index for the rate goes up or down. If we increase your APRs for any other reason, or if we change your *Fees* or other terms of your *Account*, we will notify you as required by law.

## The Law That Applies to Your Agreement

We make decisions to grant credit and issue you a *Card* from our offices in Virginia. This Agreement is governed by applicable federal law and by Virginia law. If any part of this Agreement is unenforceable, the remaining parts will remain in effect.

## Waiver

We will not lose any of our rights if we delay or choose not to take any action for any reason. We may waive our right without notifying you. For example, we may waive our right *Interest Charges* or *Fees* without notifying you and without losing our right to charge them in the future.

## Assignment

This Agreement will be binding on, and benefit, any of your and our successors and assigns. You may not sell, assign or transfer your *Account* or this Agreement to someone else without our written permission.

We may sell, assign or transfer your *Account* and this Agreement without your permission and without prior notice to you. Any assignee or assignees will take our place under this Agreement. You must pay them and perform all of your obligations to them and not us. If you pay us after we notify you that we have transferred your *Account* or this Agreement, we can return the payment to you, forward the payment to the assignee, or handle it in another way that is reasonable.

## Glossary

•**"*Access Check*"** means any check we send to you to access credit from your *Account*. We may also refer to an *Access Check* as a "convenience check" or a "purchase check".

• **"Account"** means your *Card Account* with us.

• **"Authorized User"** means a person who may use the *Card,* but is not responsible for the repayment of the *Account*.

• **"Balance Transfer"** means a *Transfer* posted to the purchase *Segment* of your *Account* unless otherwise described in your *Truth-in-Lending Disclosures*.

• **"Billing Cycle"** means the period of time reflected on a *Statement*. This period may vary in length, but is approximately 30 days. You will have a *Billing Cycle* even if a *Statement* is not required. We will often specify a *Billing Cycle* by the month in which its closing date occurs. For example, a "*March Billing Cycle*" will have a closing date in March. We may also refer to a *Billing Cycle* as a "Billing Period". If your *Account* balance has charged off, we may switch to quarterly *Billing Cycles* for your *Account*.

• **"Card"** means any Capital One credit card associated with your *Account*. This includes all renewals and substitutions. It also means any other access device for your *Account* we give you that allows you to obtain credit, including any *Account* number.

• **"Cash Advance"** means a loan in cash or things we consider cash equivalents, including wire transfers, travelers' checks, money orders, foreign currency, lottery tickets, gaming chips, and wagers. We post *Cash Advances* to the *Cash Advance Segment* of your *Account* and not to your purchase *Segment*.

• **"Fees"** means charges imposed on your *Account* not based on the Annual Percentage Rates.

• **"Interest Charges"** means any charges to your *Account* based on the application of Annual Percentage Rates.

• **"Item"** means a check, draft, money order or other negotiable instrument you use to pay your *Account*. This includes any image of these instruments. This does not include an *Access Check*.

• **"Payment Card Network"** means the network provider displayed on your *Card*. This may be Visa Inc., MasterCard International Incorporated, or any other network provider.

• **"Segments"** means the different parts of your *Account* we may establish that are subject to unique APRs, pricing, or other terms. We create these parts of your *Account* for such things as your purchases, *Balance Transfers*, *Cash Advances* and *Special Transfers*. The sum of your *Segment* balances equals your total *Account* balance.

• **"Special Transfer"** means a *Transfer* posted to a *Segment* of your *Account* that is not your purchase *Segment* or *Cash Advance Segment*.

• **"Statement"** means a document showing important *Account* information, including all transactions billed to your *Account* during a *Billing Cycle* and information about what you must pay. We may also refer to your *Statement* as a "Periodic *Statement*" or a "Billing *Statement*".

• **"Transfers"** means amounts transferred from other accounts to this *Account* and includes *Balance Transfers* and *Special Transfers*.

• **"Truth-in-Lending Disclosures"** means disclosures that the federal Truth in Lending Act and Regulation Z require for any *Account*. This includes your application and solicitation disclosures, *Account* opening disclosures, subsequent disclosures, *Statements*, and change in terms notices.



© 2014 Capital One
Capital One is a federally registered service mark.
All rights reserved.

g.      Reimbursing all costs, expenses, and disbursements accrued by Plaintiffs in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

h.      Awarding such other relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demands a jury trial on all issues in this complaint that are so triable as a matter of right.

.Dated:  February 14, 2025                  Respectfully submitted,

**KALIELGOLD PLLC**

By:*/s/ Sophia Goren Gold*
Sophia G. Gold (SBN: 307971)
490 43rd Street, Suite 122
Oakland, CA 94609
Telephone: (202) 350-4783

Jeffrey D. Kaliel (SBN 238293)
Amanda J. Rosenberg (SBN 278507)
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
arosenberg@kalielgold.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN: 330090)
scott@edelsberglaw.com
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (305) 975-3320

*Attorneys for Plaintiff and the Putative Class*

FIRST AMENDED CLASS ACTION COMPLAINT